**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** Plaintiff,

v.

**CARROLS CORPORATION, Defendant.**

No. 5:98–CV–1772(FJS).

United States District Court, N.D. New York.

Feb. 18, 2003.

Adela P. Santos, Sunu P. Chandy, Equal Employment Opportunity Commission, New York City, for Plaintiff.

Michael Delikat, John D. Giansello III, Orrick, Herrington Law Firm, New York City, for Defendant.

### Decision and Order

SHARPE, United States Magistrate Judge.

Pending are cross-motions to compel discovery by plaintiff, the Equal Employment Opportunity Commission ("EEOC"), and the defendant, Carrols Corporation ("Carrols"). *See Dkt. Nos. 21, 25–26, 29–33; 53–54.*

### I. Background

Carrols, a Burger King franchisee, operates approximately three hundred restaurants in fourteen states. The restaurants are subdivided into six regions, and each region is headed by a general manager and human resources department. Nonetheless, the restaurants and regions are centrally managed and subject to a company-wide sexual harassment policy.

On May 1 and July 2, 1996, Wendy McFarlan, a Glens Falls, New York, employee filed a sex discrimination charge with the EEOC. The EEOC began a McFarlan investigation, and subsequently expanded it to include all Carrols' employees from 1990 to present.[1] Apparently unable to negotiate a conciliation agreement, the EEOC sued on November 17, 1998.

EEOC's complaint asserts that Carrols has engaged in a "pattern and practice" of unlawful employment practices on the basis of sex, retaliation and constructive discharge. *See Civil Rights Act of 1964, §§ 703–704, 707, as amended, 42 U.S.C. §§ 2000e–2(a), 3(a) and 6.* It further alleges that Carrols has fostered a hostile work environment resulting in explicit physical and verbal sexual conduct directed at its female employees, all while the corporation has taken few, if any, remedial measures to curtail the conduct. Instead, complainants have suffered retaliation through adverse employment conditions and constructive discharge. Accordingly, the EEOC seeks a permanent injunction precluding Carrols from engaging in such conduct, an order directing that Carrols institute new remedial measures to eradicate the conduct, and compensatory and punitive damages.

Carrols denies the allegations, asserting that its corporate policies forbid such conduct, that remedial procedures exist to deal with complaints, and that its managers receive sexual harassment training. Carrols also complains that the suit exceeds the permissible scope of any reasonable investigation precipitated by the original McFarlan charge.

The parties' divergent views concerning the scope of the litigation have generated their discovery disputes. Both concur that the EEOC's focus on Carrols began with the 1996 McFarlan complaint. Consistent with its statutory obligations, the EEOC notified Carrols of the complaint, conducted an investigation and sought to conciliate the controversy before suing. *See 42 U.S.C. § 2000e–5(b).* Carrols asserts that the EEOC focused on McFarlan, and never filed a Commissioner's charge formally notifying Carrols of a

---

1. The complaint asserts continuous conduct from 1990 until the "present." Obviously, present meant 1998, the date of filing. The EEOC now states, however, that its investigation has revealed continuing discrimination.

wide-spread pattern and practice investigation.

During discovery, the EEOC obtained Carrols' database for the years 1994–1998, and mailed cover letters and questionnaires to employees. *See Carrols Ltr., Ex. C, Dkt. 21.* It received hundreds of written and verbal responses from former and current employees. According to the EEOC, those responses disclosed substantial information about sexual harassment, retaliation and constructive discharge. In fact, the EEOC asserts it now has identified more than one hundred and fifty instances of physical abuse, and has developed substantial information to support the argument that Carrols' has no real sexual harassment policy whatsoever.

Carrols counters that the pattern and practice claims are essentially *de minimis* in light of the geographic breath and extended time frame of the investigation, and given the sheer number of employees involved. It reiterates that the complaint covers four hundred restaurants in thirteen states, and between one and two hundred thousand employees over a ten year period. Carrols complains that the EEOC intends to prove pattern and practice through unrelated and statistically insignificant, individual cases, requiring Carrols to respond with a broader picture. Accordingly, it claims its discovery needs are different.

## II. *The Discovery Disputes*

On March 5, 2001, Carrols complied with this District's Local Rules, and sought judicial intervention to resolve the discovery disputes. *See Mar. 2, 2001, Carrols Ltr. and Attachments, Dkt. 21.* The EEOC responded on April 9 and Carrols replied on April 16. *See EEOC Ap. 6, 2001, Ltr., Dkt. No. 25; Carrols Ap. 13, 2001, Ltr., Dkt. No. 26.* The court then conducted a discovery hearing on April 17. *See Transcript, Dkt. No. 30.* At that hearing, the court resolved some disputes and refined others, and the parties then filed their motions to compel.[2]

Furthermore, the discovery motions have been supplemented in accordance with Judge Scullin's order permitting additional discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. Carrols continues to oppose production of its employee data base, and the EEOC seeks depositions of Carrols' managers. *See Dkt. Nos. 53–54.*

In summary, Carrols now seeks: (1) copies of completed questionnaires received by the EEOC from those designated as claimants or potential claimants; (2) statements of fact certified by the EEOC that reflect "communications" between the EEOC and claimants or potential claimants (e.g., communications through mediums other than the questionnaires); (3) pattern and practice statistical data derived by the EEOC through the use of questionnaires; (4) statistical and comparative data in the EEOC's possession or subject to its control relative to similar sexual harassment complaints in companies of a size comparable to Carrols; and, (5) the identification of Carrols' written policies and programs that the EEOC claims are evidence that Carrols intentionally tolerated sexual harassment. *Dkt. No. 29.* In its cross-motion, the EEOC seeks production of Carrols' employee database from 1999–present, and managerial depositions. *Dkt. No. 31 at 9 and Ex. 1; Dkt. No. 54.*

As to Carrols' demands, the EEOC responds: questionnaires and certified factual summaries of claimant communications are protected by the work product doctrine and the attorney client privilege; it did not compile statistical data concerning the mailing and receipt of questionnaires; the production of statistical and comparative data would be burdensome and necessary only if Carrols retains an expert for comparative purposes; and, to compel it to identify specific written policies and procedures it claims are evidence that Carrols intentionally tolerated sexual harassment would compel unwarranted legal conclusions. As to facts generated by the

---

**2.** Parenthetically, the court thought it had orchestrated at least a preliminary resolution regarding claimant questionnaires when the EEOC offered to provide factual summaries. However, during a conference held after the parties orally argued Carrols' motion for summary judgment (*see Dkt. No. 50*), the court discovered that such summaries had never been disclosed. This, of course, is not a disparaging observation of the parties, but rather a fundamental misunderstanding by the court.

questionnaires and subsequent communications, the EEOC has offered to provide factual detail in a narrative form. *See May 23, 2001, EEOC Ltr., Dkt. No. 31 at p. 2, fn. 4.*

As to the EEOC demands, Carrols has refused to supply an updated employee database, arguing that some outside parameters to the EEOC investigation must be fixed. Otherwise, it is compelled to defend a moving target that constantly expands. The EEOC responds that it must fulfill its responsibilities to the public and potential claimants. As to the deposition request, the EEOC seeks to depose approximately fifty present and former Carrols' managers to determine how the corporation handled sexual harassment complaints. *See Scullin, D.J., Ord. at 2, Dkt. No. 50; Santos Aff., Dkt. No. 44.* Carrols responds that in light of the EEOC's inability to establish the first prong of its pattern and practice claim (pervasive discrimination), the requested depositions are burdensome and over broad. *Carrols Reply Mem., pp. 22–24, Dkt. No. 45.*

### III. *Legal Discussion*

In order to resolve the motions, the court first addresses the essential components of the pattern and practice claims, and then turns to the actual disputes.

#### · A. *The Pattern and Practice Claims*

■ Since 1972, the EEOC has been authorized to sue private-sector employers who engage in a pattern and practice of discrimination. *42 U.S.C. § 2000e–6; see also, International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 329, fn. 1, 97 S.Ct. 1843, 1851, 52 L.Ed.2d 396 (1977); *see also, General Telephone Company of the Northwest, Inc. v. EEOC,* 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). The EEOC bears the initial burden of proving by a preponderance of the evidence that "discrimination was the company's standard operating procedure [*sic*] the regular rather than the unusual practice." *International Brotherhood of Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1855; *see also, Coser v. Moore,* 739 F.2d 746, 749 (2d Cir.1984). Using this definition of pattern and practice, the Supreme Court recognized that Congress did not intend the

phrase as a term of art, stating that "the Government ultimately had to prove more than a mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *International Brotherhood of Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1855.

Furthermore, *International Brotherhood of Teamsters* extended the *McDonnell Douglas* burden-shifting analysis to pattern and practice cases. *Id.* at 357, 97 S.Ct. at 1866; *see also, McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Thus, the EEOC must prove a prima facie case of systemic sexual discrimination, retaliation and constructive discharge. Carrols must then rebut, and the EEOC maintains the burden of proof by a preponderance of the evidence. *International Brotherhood of Teamsters,* 431 U.S. at 342–43, 97 S.Ct. at 1858.

■ Naturally, the plaintiff in the action is the government; namely, the EEOC. If it is successful in proving its pattern and practice claims, Carrols is liable. · However, the EEOC is not required at the liability phase "to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy." *Id.* at 360, 97 S.Ct. at 1867. Liability at that juncture may warrant prospective relief, but individual claimant relief may require further proceedings. *Id.* at 361, 97 S.Ct. at 1867–68; *see also, General Telephone Company of the Northwest, Inc. v. EEOC,* 446 U.S. 318, 321–22, 100 S.Ct. 1698, 1702, 64 L.Ed.2d 319 (1980) (EEOC sought bifurcation of liability and individual damages issues); *Coser v. Moore,* 739 F.2d at 751–52, and fn. 2.

In proving pattern and practice liability, plaintiffs, including the EEOC, usually rely on individual testimony concerning specific instances of discrimination (so-called "anecdotal evidence"), statistical data and expert opinions concerning statistical data. *International Brotherhood of Teamsters* at 337–38, 97 S.Ct. at 1855–56; *see also, EEOC v. Shell Oil Company,* 466 U.S. 54, 69–71, 104 S.Ct. 1621, 1631–32, 80 L.Ed.2d 41 (1984); *Coser v. Moore,* 739 F.2d at 749. It is equally common that employers defend by attempting to demonstrate the existence of a

comprehensive affirmative action program, arguing that the program is the anthesis of a pattern and practice of discrimination. *Coser v. Moore* at 751. So too, they typically argue that the anecdotal evidence is sporadic, statistically insignificant, and therefore insufficient to establish a pattern and practice.

Since a suit brought by the EEOC may not insulate a company from private liability, the Supreme Court has observed that courts "are not powerless to prevent undue hardship to the defendant ... [and] ... may, by discovery and other pretrial proceedings, determine the nature and extent of the claims the EEOC intends to pursue against it." *General Telephone* 446 U.S. at 333, 100 S.Ct. at 1708. In this context, the court turns to the disputes.

### B. *Discovery Disputes*

#### 1. *Claimant Written and Verbal Communications*

Using Carrols' database, the EEOC mailed cover letters and questionnaires to employees soliciting information relevant to the issues asserted in the complaint. *See Dkt. No. 21, Ex. C.* The EEOC received numerous written and verbal responses, the latter generating EEOC notes based upon the conversations.[3] Carrols has demanded copies of the questionnaires and notes. The EEOC has responded that both are protected by the attorney-client privilege and the work product doctrine.

As to the work-product doctrine, Carrols responds: the questionnaires are not the EEOC's product since they were filled out by claimants; any EEOC notations can be redacted; and, the doctrine does not protect relevant facts and can be overcome, in any event, by a demonstration of substantial need. As to substantial need, Carrols asserts that discovery by any other means would be oppressively difficult, time-consuming and expensive. *Dkt. No. 29 at 9; Dkt. No. 32 at 2–4.* Carrols has failed to address

its claim that EEOC verbal interview notes are not protected by the doctrine.[4]

■ In *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the Supreme Court articulated the work product doctrine as the basis for precluding discovery of written witness statements and oral summaries obtained by an attorney in anticipation of litigation. Thus, the Court observed:

> ... [I]t is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be relevant from irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference ... Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and cause of justice would be poorly served.

*Id.* at 510–11, 67 S.Ct. at 393–94. The court recognized that an adversary had a variety of discovery options to gather the information, including interrogatories and depositions. It also, however, recognized an exception if an adversary could demonstrate a particularized need for disclosure. *Id.* at 511–12, 67 S.Ct. at 394–95. Now codified at Fed.R.Civ.P. 26(b)(3), the work product doctrine is entirely separate from, and broader than, the attorney client privilege. *United States v. Nobles,* 422 U.S. 225, 238 fn. 11, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975); *In re Grand Jury Proceedings,* 219 F.3d 175, 190 (2d Cir.2000).

■ Carrols' argument that claimants, not the EEOC, filled out the questionnaires thus

---

3. At the discovery conference, the parties concurred that the EEOC had identified approximately 275 claimants. As the court understood the dynamics, the EEOC had received anecdotal information from more than 275 people, but only 275 wished to be involved in the suit.

4. In any event, the Supreme Court specifically disagrees with Carrols' claim. *See Upjohn Company v. United States,* 449 U.S. 383, 399–400, 101 S.Ct. 677, 687–88, 66 L.Ed.2d 584 (1981).

voiding work product protection is unavailing. In *Hickman* and *Upjohn*, the Supreme Court afforded such protection to witness statements and such statements incorporated in questionnaires. *Hickman*, 329 U.S. at 498, 67 S.Ct. at 387; *Upjohn*, 449 U.S. at 387, 101 S.Ct. at 681. Furthermore, Carrols' bald assertion that the work product doctrine does not protect "relevant facts" is ludicrous. While it may not protect them if there is a substantial need, relevance is not the criteria. Since· the parties do not dispute that the questionnaires were prepared in anticipation.. of litigation, the EEOC has properly invoked the doctrine, *United States v. Construction Products Research*, 73 F.3d 464, 473 (2d Cir. 1996), and the only remaining question is substantial need.

 Substantial need is not evaluated in a vacuum, and in order to overcome work product protection, Carrols must demonstrate that it cannot obtain the substantial equivalent of the information it seeks. *Horn & Hardart Company v. Pillsbury Company*, 888 F.2d 8, 12 (2d Cir.1989). That does not mean that it must show an absolute impossibility, but rather that it is significantly more difficult, time-consuming or expensive to obtain the information from another source. *Sec. & Exch. Com. v. Thrasher*, 1995 WL 46681, at *9 (S.D.N.Y. Feb.7, 1995). Of course, the prospect that other means are available to obtain the information may diminish the substantial need. *Xerox Corporation v. I.B.M.*, 79 F.R.D. 7 (S.D.N.Y.1977) (depositions); *EEOC v. Pasta House Co.*, 1996 WL 120648 (E.D.Mo. Jan.29, 1996) (questionnaires).

 The EEOC has offered to supply Carrols with witness summaries that will serve to identify the witness and provide at a least

some insight into the witnesses' likely testimony. Armed with that information, Carrols is then free to utilize other discovery devices to obtain more detailed information. While it is true that those devices may be more expensive than the reproduction costs of the questionnaires and EEOC notes, the devices do provide an alternative to impinging upon the work-product protection. Accordingly, the EEOC must provide the summaries it offered at the discovery conference.[5]

## 2. *Statistical Data*

Carrols has requested disclosure of statistical data generated from two sources. First, it requests statistical information generated from an analysis of the questionnaires sent to employees as those statistics relate to a pattern of discrimination. Secondly, it seeks comparative statistical data in the possession or control of the EEOC that relates to the incidence of sexual harassment or retaliation complaints in workforces comparable in size, turnover rate, dispersion or working conditions to those of Carrols. *Dkt. No. 29 at 1*. As to the first category, the EEOC states that it did not maintain the statistical questionnaire data that Carrols seeks. *Dkt. No. 31 at 7–8*. As to the second category, it argues that the request is irrelevant, over broad and burdensome. *Id. at 8*.

 It is axiomatic that a request to produce relevant documents is subject to that caveat that a party must have the documents in its "possession, custody or control." *Fed. R.Civ.P. 34(a)*. In other words, a party cannot produce that which it does not have. *Fisher v. U.S. Fidelity & Guar. Co.*, 246 F.2d 344, 350 (7th Cir.1957). Since the EEOC did not keep or maintain information sufficient to respond to Carrols' statistical request related

---

**5.** Because the claimant communications are protected by the work-product doctrine, the court need not address the attorney-client privilege. Nonetheless, there are prerequisites to the invocation of that privilege. "[T]he privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence

of strangers (c) for the purpose of securing primarily either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client." *Colton v. United States*, 306 F.2d 633, 637 (2d Cir. 1962). Since the EEOC seeks to invoke the privilege, it would bear the burden of proving its application. It is not at all clear that the EEOC has satisfied its obligation to factually demonstrate each of the recited elements.

to the questionnaires, it cannot be required to produce that which it does not have.

■ The subject of Carrols' second statistical request is more troublesome in light of the EEOC's response. Without specifically stating so, the EEOC cites the limits on discovery imposed by Fed.R.Civ.P. 26(b)(1)(2). First, it argues that the information is not relevant. The court had an extensive colloquy with the EEOC concerning relevance during the discovery conference. *See Dkt. No. 30 at 39–42. If* the EEOC had agency generated statistical studies concerning the incidence of sexual harassment, retaliation and constructive discharge in an industry comparable to that of Carrols, and the extent to which the number of such incidents reflected a pattern and practice when compared by percentage to the entire work force, such studies might well be relevant. More simply, five complaints per thousand employees is less conducive to proving pattern and practice than five hundred complaints per thousand. Therefore, *if* such information exists, it would be relevant to this suit. Furthermore, the EEOC itself has often used statistical studies in support of other pattern and practice suits. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 339–41, 97 S.Ct. 1843, 1856–57, 52 L.Ed.2d 396 (1977).[6]

As to burden of production, the EEOC, in part, misconstrues Carrols' request. Thus, it asserts that Carrols "appears to hold EEOC responsible for any studies which may be contained in an obscure academic journal in the Library of Congress." *Dkt. No. 31 at 8.* Carrols' request is not that broad. Rather, it is specifically limited to the characterization the court recited in the preceding paragraph. Given the limitation, Carrols' observation is apt: "Carrols does not know if the EEOC has such data or studies ... If it does not, it need only say so, and that will end the

inquiry." *Dkt. No. 29 at 3, fn. 3.* The EEOC, however, does not say so. Instead, it suggests by innuendo that if the information does exist, it could be located in any of its fifty field offices or Washington, D.C., headquarters.

The EEOC response to this issue is woefully lacking. Having decided that the information may be relevant, the court cannot assess the burden of production. The first inquiry must be whether it exists. Next, presuming that it does, the court should assess the burden of retrieving and producing it. Lastly, the court should determine whether there is some privilege or other legal impediment precluding production.[7] On the basis of this record, the EEOC has offered nothing to support the second two prongs of the inquiry, and since the material may be relevant, it must produce it if it has it.

In summary, the EEOC cannot produce questionnaire statistical data since it certifies it does not have it. As to statistical data that relates to the incidence of sexual harassment or retaliation complaints in workforces comparable in size, turnover rate, dispersion or working conditions to that of Carrols, such data is relevant and the EEOC has failed to satisfy its burden of proving that its production is burdensome or that the data is privileged. Accordingly, it must ascertain whether it has such information and, if so, produce it.

### 3. *Carrols' Written Policies and Procedures*

By interrogatory, Carrols has requested that the EEOC identify those portions of its written policies and programs that "the EEOC contends constitute evidence that Carrols has intentionally maintained a pattern and practice of toleration of sexual harassment." *Dkt. No. 29 at 3.*[8] The EEOC

---

**6.** By no means does the court suggest that the EEOC has used, or maintains, statistical studies akin to that requested by Carrols.

**7.** For instance, the EEOC does not say that such material exists, but baldly asserts that if it does, it is protected by the deliberative process privilege. *Dkt. No. 31 at 8, fn. 7.* The court cannot decide such an issue in a vacuum. For all the court

knows, the studies exist, and the EEOC itself has published them in an obscure academic journal housed in the Library of Congress.

**8.** As to the actual language and the specifics of the requests, Carrols has attached the interrogatories and its legal analysis to its motion to compel. *See Dkt. No. 21 at 17–20; Ex. E, pp. 63–64, 82–84.*

responds that the request requires revelation of its litigation and trial strategy, and forces it to provide Carrols with "free legal advice." *Dkt. No. 31 at 9.* Although the court believes this dispute is frivolous (*see Dkt. No. 30 at 46* ), it nonetheless turns to the merits.

Fed.R.Civ.P. 33(c) provides, in part:

An interrogatory otherwise proper is not necessarily objectionable merely because an answer involves an opinion or contention that relates to fact or the application of law to fact . . .

As the Advisory Committee Notes reflect, contention interrogatories are most useful to narrow and sharpen issues, a major purpose of discovery. *See Fed.R.Civ.P. 33, Advisory Committee Notes, 1970 Amendment, Subdivision (b)(currently subdivision (c)).* There has always been dispute involving questions that call for opinions, but since 1970, the Rule permits it. While it may be true that the Rule does not permit questions calling for pure legal conclusions, legal conclusions that require the application of law and fact are authorized. *See 8A Wright, Miller & Marcus, Federal Practice and Procedure, § 2167 (2d ed.1994).* The court recognizes, however, the need to orchestrate the timing of such interrogatories to avoid locking the parties into misconceived contentions that hinder the ultimate resolution of the case on the merits.

 Here, the EEOC asserts that Carrols has engaged in a pattern and practice of sexual harassment, and apparently concedes that it has Carrols' written policies and procedures regarding this subject. Carrols requests that the EEOC state which portions of those *written* policies the EEOC contends demonstrate a pattern and practice of intentional discrimination. It is clear to the court, and the court suspects to the parties, that the EEOC does not contend that Carrols had a specific written policy of intentional discrimination. Rather, it contends that regardless of Carrols' written policies, its conduct demonstrated intentional discrimination by either ignoring the policies or by failing to implement them properly. Obviously, Carrols seeks a concession that there is nothing wrong with its policies. Although the court cannot fathom how an answer will serve Carrols' interests in light of the EEOC's obvious theory of liability or how an answer constitutes a concession, an answer does call for the application of opinion to fact; namely, whether the written policies (facts) evidence a pattern of discrimination (opinion).

An answer does not require the EEOC to disclose litigation or trial strategy that it has not already disclosed nor does it constitute free legal advice. Furthermore, there is no reason to delay an answer because no party will be locked into a misconceived contention nor will the merits of the case be hindered. It is clear that the EEOC relies on the extent to which, if any, Carrols implemented its policies. *See Dkt. No. 31 at 8.* As Carrols has stated, if the EEOC does not contend that a *written* policy demonstrates a pattern of discrimination, it need only say so. *Dkt. No. 32 at 6.* It is time for the EEOC to say so.

### 4. *Carrols' Employee Database*

 During discovery, the EEOC requested computerized data of Carrols' personnel, including social security number, pay and benefit information and position held, from 1990–present. *Dkt. No. 31 at 9.* The parties met and conferred to resolve Carrols technical problems, and Carrols complied with the request for the years 1994–98. At the April 30 discovery conference, the parties agreed to an accommodation for the years 1990–1993. *Id. at 10.* Following the conference, Carrols supplied 1999 data, but deleted information earlier supplied; namely, pay and benefit information, social security number and store location. *Id.* The EEOC asserts that it needs the information to correctly identify employees, find current addresses, assess claims, and remove duplicate names. The EEOC also asserts that it needs additional years because it continues to receive charges of discrimination against Carrols. *Id.*

Carrols counters that the EEOC already has sufficient information to prosecute its action, that employee pay and benefit information is irrelevant to the suit, and that the burden of further production is onerous. *Dkt. No. 32 at 7–8.* As to relevance, the EEOC counters that its class suit alleges continuing harassment and according to its

statutory mission, it is obliged to identify all potential victims for at least the period of time set by the court as a limitation period. *See Dkt. No. 33 at 2–3.*

At times, courts have struggled with the balance required to accommodate the competing concerns reflected by this dispute. *See EEOC v. Venator Group,* 2001 WL 246376 (S.D.N.Y. Mar.13, 2001); *EEOC v. Optical Cable Corporation,* 169 F.Supp.2d 539 (W.D.Va.2001). Furthermore, it is not at all clear that this court has the authority to definitively close the claims period as the EEOC suggests. While this is not a Fed. R.Civ.P. 23 class action, it is certainly analogous, and there are limits on the class action authority of magistrate judges. *See 28 U.S.C. § 636(b)(1)(A).* As in *Venator Group* and *Optical Cable Corporation,* it may be that the court will have to consider closure in a future discovery order. However, it would be premature to do so now.

Carrols also adds in a supplemental submission that production of the database will further prolong the action, including disposition of the summary judgment motion. *See Dkt. No. 53.* Naturally, that assertion unwarrantedly presumes the court lacks the ability to control the litigation. Whether the EEOC can meet the first discriminatory prong of a pervasive practice of discrimination is a subject the District Court controls with its ultimate decision on the motion for summary judgment. That does not mean, however, that pretrial discovery should not continue in other phases of the litigation. Otherwise, the case would be subject to piecemeal, time consuming delays that would operate to the detriment of all concerned. Therefore, the balance of equities is with the EEOC, and Carrols must comply with the discovery request, supplying the complete data from 1999 to December 31, 2001.

### 5. *Depositions*

The EEOC seeks managerial depositions, presumably of those who have direct knowledge of Carrols' discrimination policies, the manner in which those policies were enforced, and the impact of both on those whom the EEOC asserts were subjects of discrimination. Carrols resists the depositions for the same reason it resists production of the employee database. Its principal argument is that its motion for summary judgment will be successful on the first pattern and practice prong, and therefore the depositions which relate to the second prong are unnecessary. For the reasons previously articulated, the dispositive issue is one for the District Court, and further discovery should not be subject to piecemeal litigation.

The court is, however, receptive to reducing the time and expense of necessary depositions, and expects the parties to realistic appraise their options under the federal rules and cordially work with one another to accomplish the task as quickly and as economically as is feasible.

### IV. *Conclusion*

Accordingly, and based upon the foregoing, it is hereby

**ORDERED** that the motions and cross-motions to compel discovery filed by the Equal Employment Opportunity Commission (EEOC) and by Carrols Corporation ("Carrols") (*Dkt. Nos. 21, 25–26, 29–33, 53–54* ) are **GRANTED IN PART AND DENIED IN PART AS HEREINAFTER RECITED:**

1. Carrols' motion to compel disclosure of claimant questionnaires and statements of fact certified by the EEOC as reflecting non-questionnaire communications between EEOC personnel and claimants is **DENIED** with leave to renew should the EEOC fail to provide written claimant or witness summaries, as previously offered, such production to occur on or before **APRIL 14, 2003;**

2. Carrols' motion to compel disclosure of questionnaire statistical data is **DENIED** since the EEOC has certified that it possess no such data;

3. Carrols' motion to compel disclosure of comparative statistical data in the possession and control of the EEOC that relates to the incidence of sexual harassment or retaliation complaints in the workforce comparable to Carrols in size, turnover rate, dispersion or working conditions is **GRANTED** and **shall** be disclosed on or before **May 14, 2003,** **unless** the EEOC earlier certifies that no such statistical data exists;

4. Carrols' motion to compel the EEOC to identify Carrols' written policies and programs that the EEOC claims are evidence that Carrols intentionally tolerated sexual

**56**

harassment is **GRANTED,** and the EEOC **shall** comply on or before **April 14, 2003;**

5. The EEOC motion to compel Carrols to produce the employee database is **GRANTED,** and Carrols is hereby directed to produce the database (including information related to pay and benefits, social security number and store location), through December 31, 2001, on or before **APRIL 14, 2003;** and,

6. The EEOC motion to compel depositions of Carrols' managers is **GRANTED,** subject to the admonition recited in this opinion, and unless such date is further extended, such depositions shall be concluded on or before **MAY 14, 2003;** and, it is further

**ORDERED** that the parties shall consult and confer, and thereafter notify the court, in writing, on or before **MARCH 14, 2003,** concerning any other outstanding case management or non-dispositive issues, and a proposed dispositive motion filing deadline, and it is further

**ORDERED** that the Clerk of Court serve this decision and order on the parties by regular mail.

**SO ORDERED.**