**Julia R. COHEN, Plaintiff,**

v.

**The CITY OF NEW YORK, a municipal entity, New York City Police Officers Steven Choinski, Shield # 28673, and "John Does" and "Sally Rowes," individually and in their official capacities, Joseph Esposito, individually and in his official capacity as Chief of the New York City Police Department, Raymond Kelly, individually and in his official capacity as New York City Police Commissioner, Bruce Smolka, individually and in his official capacity as an Assistant Chief in the New York City Police Department and in Patrol Borough Manhattan South, Defendants.**

No. 05 Civ. 6780(RJS)(JCF).

United States District Court,
S.D. New York.

Nov. 10, 2008.

James I. Meyerson, New York, NY, for Julia R. Cohen.

James Mirro, Law Department of the City of New York, New York, NY, for Defendants.

Harry Sandick, Daniel L. Greenberg, Edward D. Altabet, Christina A. Suarez, Shulte Roth & Zabel LLP, New York, NY, for I-Witness Video.

Robert J. Boyle, New York, NY, for New York City Chapter of National Lawyers Guild.

## MEMORANDUM AND ORDER

JAMES C. FRANCIS IV, United States Magistrate Judge.

The New York City Chapter of the National Lawyers Guild (the "Guild"), working in conjunction with I–Witness Video ("I–Witness"), arranged for the video recording of arrests that took place in connection with protests at the Republican National Convention (the "RNC") in Manhattan in 2004. More than 80 cases have been filed in this Court by approximately 400 arrestees who allege that their constitutional rights were violated by the City of New York, the New York City Police Department (the "NYPD"), and various municipal officials and NYPD officers (collectively, the "City"). A dispute has now arisen in the instant case [1] concerning subpoenas served by the City on the Guild and on I–Witness seeking copies of the videotapes and other information gathered in connection with the arrests.

*Background*

The National Lawyers Guild is a progressive bar association committed to advancing civil rights and civil liberties, and it provides

---

1. The issue first arose in the context of this case because the plaintiff, Julia R. Cohen, testified during the course of her deposition that she had been in possession of certain videotapes but had turned them over to the Guild. Although Ms. Cohen sought to quash a subpoena served on the Guild, it is questionable whether she has standing to do so. In any event, the contentions that she raised have since been subsumed within the legal arguments advanced by the Guild itself, and will be addressed in that context.

representation for persons who voice dissent from governmental policies. (Declaration of Bruce K. Bentley dated April 10, 2008 ("Bentley Decl."), ¶¶ 4, 6–9). Accordingly, the Guild has created a "Mass Defense Committee" that refers persons arrested during mass protests to attorneys willing to represent them in subsequent criminal and civil proceedings. (Bentley Decl., ¶ 7). In addition, the Mass Defense Committee provides legal observers for demonstrations in New York City. (Bentley Decl., ¶ 11). These observers, acting under the direction of Guild attorneys, "document demonstrator and law enforcement conduct, including arrests, and serve thereby to discourage acts of state officials, police officers, or other persons that would interfere with the free exercise of constitutional rights." (Bentley Decl., ¶¶ 11, 12).

Prior to the RNC, it was expected that the convention would be accompanied by massive protests and numerous arrests. (Bentley Decl., ¶ 13). Consequently, the Guild recruited hundreds of lawyers to represent the protesters. (Bentley Decl., ¶ 14). It also provided training sessions for legal observers.

> Legal observers were instructed by attorneys to note the name and descriptions of arrestees, names and badge numbers of police, and time, location and other identifying circumstances of the arrests so that the arrestees could be tracked through the system and paired with an individual lawyer. Legal observers were also trained to quickly contact potential witnesses at the scene of an arrest for their names and telephone numbers, so that they could be later interviewed by attorneys. A form was prepared onto which legal observers would note information.... In addition, all [Guild] legal observers were required to sign a "Legal Observer Confidentiality Agreement" acknowledging that their role created attorney-client relationships.

(Bentley Decl., ¶ 15 & Exh. B). When the legal observers witnessed arrests during the RNC, they turned their notes over to the Guild, which in turn scanned them into computers and provided them to the individual criminal defense attorneys who represented arrestees. (Bentley Decl., ¶¶ 16, 19).

Following the RNC, the Guild received more than one hundred videotapes that had been taken of protest activities and arrests. (Bentley Decl., ¶ 26). Some had been recorded by legal observers (Bentley Decl., ¶ 26), some by volunteers recruited by I–Witness Video, and others by members of the NYPD's Technical Assistance Response Unit ("TARU"). (Declaration of Eileen Clancy dated June 18, 2008 ("Clancy Decl."), ¶¶ 14, 19, 28). The TARU tapes had been turned over to defense attorneys by the district attorney's office during the course of criminal proceedings brought against individual arrestees. (Clancy Decl., ¶ 19). The videos were in various formats, and the Guild arranged for I–Witness to transfer each video to VHS format in return for a modest fee. (Bentley Decl., ¶ 27). Thereafter, each original video was returned to its owner. (Bentley Decl., ¶ 27).

In 2005, the Guild planned to relocate its offices and experienced an unrelated flood in the facility where it was located. (Bentley Decl., ¶ 28). The Guild then transferred the RNC videotapes to I–Witness "in recognition of the hours it had spent doing copying" for very little pay. (Bentley Decl., ¶ 28). In addition, the Guild asked I–Witness to store the hard copies of the legal observer notes in order to avoid water damage. (Bentley Decl., ¶ 29).

I–Witness Video was formed in 2000. (Clancy Decl., ¶ 4). It has one full-time employee, Eileen Clancy, and was an unincorporated association until it incorporated in January 2008. (Clancy Decl., ¶¶ 4, 7). Its stated mission is to

> document protests and demonstrations, focusing largely on the role of police; assist[ ] attorneys in the defense of people who were improperly arrested; track[ ] and research[ ] police tactics; and develop[ ] high-impact, quality news stories to educate the public and to expose and correct the manipulation of the truth by the police both in the courts and in the court of public opinion.

(Clancy Decl., ¶ 6). I–Witness relies on volunteer videographers who donate their time and use their own recording and duplicating equipment. (Clancy Decl., ¶ 7).

Like the Guild, I–Witness anticipated that there would be demonstrations and arrests during the RNC, and it planned to record these events. (Clancy Decl., ¶¶ 11–12). It decided to collaborate with the Guild, and the Guild paid for blank videotapes to be used by I–Witness' volunteer film-makers. (Clancy Decl., ¶ 13). I–Witness, in turn, trained its volunteers as well as the Guild's legal observers in how to prepare videotapes that could be used in court proceedings. (Clancy Decl., ¶ 13). Volunteers were asked to sign a form in which they agreed not to disclose confidential information to "any law enforcement agency or government entity." (Clancy Decl., ¶ 16 & Exh. A).

During the RNC, I–Witness volunteers, sometimes accompanied by Guild legal observers, videotaped protests and arrests at various locations throughout New York City. (Clancy Decl., ¶ 14). More than 150 videotapes were initially provided to I–Witness by these volunteers as well as by private individuals, independent film-makers, and free-lance journalists. (Clancy Decl., ¶ 14). I–Witness made copies of the videos and placed them in its archives, along with the original videos in those instances when they were donated. (Clancy Decl., ¶ 15). Over a period of approximately six months after the RNC, I–Witness received more than 100 additional videotapes from other sources, including tapes produced to defense counsel by the district attorney's office. (Clancy Decl., ¶¶ 15, 19).

I–Witness volunteers, working with Guild attorneys, then reviewed all of the videotapes. The Guild paid Ms. Clancy $1,100.00 per month at the beginning of 2005 to coordinate this process. (Clancy Decl., ¶ 18). By agreement between the Guild and I–Witness, the tapes remained the property of I–Witness. (Clancy Decl., ¶ 18). I–Witness also acquired legal observer notes and photographs from the Guild in June 2005 when the Guild was relocating. Although this was intended to be a temporary arrangement, this property remains in I–Witness' possession. (Clancy Decl., ¶ 23).

When I–Witness provided videotapes to defense counsel during the criminal prosecu-

tions of protesters, it did so without charge. (Clancy Decl., ¶ 24). However, I–Witness determined that it would charge a fee for the use of the tapes in connection with civil litigation, and in January 2006 it established a fee schedule of $500.00 per tape, together with discounts for volume purchases. (Clancy Decl., ¶ 24 & Exh. H). According to Ms. Clancy, the fee was set on the basis of such factors as the cost of collecting the footage, the cost of preservation, and the ability of I–Witness to vouch for the integrity of each tape for purposes of admissibility in legal proceedings. (Clancy Decl., ¶ 25). One group of plaintiffs in the RNC litigation chose to take up this offer, buying five tapes for $2,500.00 and paying Ms. Clancy another $225.00 for her assistance in reviewing the footage. (Clancy Decl., ¶ 25).

When the City learned of the existence of videotapes and of the activities of the Guild during the RNC, they served a subpoena on the Guild dated June 29, 2006, which demanded production of "[a]ny and all videotapes and photographs concerning demonstrations, protests, marches, parades, bicyclists, and/or arrests in New York City from August 26, 2004 through September 4, 200[4]"[2] and "[a]ny and all documents relating to the training of legal observers for the Republican National Convention in New York City in 2004." (Subpoena dated June 29, 2006 (the "June 2006 Subpoena"), attached as Exh. A to Letter of James Mirro dated March 14, 2008 ("Mirro 3/14/08 Letter")). The Guild initially objected to the subpoena on the grounds that it was overbroad and that it sought material in violation of the free speech and free association rights of the Guild and its legal observers. (Letter of Robert J. Boyle dated Aug. 17, 2006, attached as Exh. C to Mirro 3/14/08 Letter). However, after some negotiation, the Guild agreed to comply, provided that the City enter into a strict protective order. Accordingly, the parties submitted a proposed order on consent that required production of the requested materials subject to various restrictions concerning their use and dissemination. I signed that order on October 20, 2006. (Order dated Oct. 20,

---

**2.** The subpoena actually refers to September 4, 2006, but this is a typographical error.

2006 ("10/20/06 Order"), attached as Exh. F to Mirro 3/14/08 Letter).

The Guild then turned over two videotapes and stated that these represented all responsive items in its possession and control. (Letter of Robert J. Boyle dated Dec. 13, 2006 ("Boyle 12/13/06 Letter"), attached as Exh. G to Mirro 3/14/08 Letter). In subsequent depositions, however, plaintiffs testified to having seen hundreds of videotapes in the Guild's offices. (Deposition of Joseph P. Carranza, attached as Exh. H to Mirro 3/14/08 Letter, at 89, 91; Deposition of Julia R. Cohen, attached as Exh. J to Mirro 3/14/08 Letter, at 128–29). Consequently, the City issued a subpoena seeking the testimony of a witness concerning the Guild's practices in connection with the handling of videotapes, notes, and other evidence relating to arrests during the RNC. The subpoena further demanded the production of:

> (i) videotapes, photographs, notes and any other evidence (or potential evidence) relating to arrests made in late August and early September 2004 (around the time of the Republican National Convention); and (ii) any document (s) listing, showing or referring to the location, types or volume of such evidence collected by or provided to the [Guild] (including any index(es) of the foregoing materials); and (iii) any document(s) showing the source of such evidence and the names of the individuals who had custody of such evidence . . . .

(Subpoena dated Jan. 18, 2008 (the "January 2008 Subpoena"), attached as Exh. O to Mirro 3/14/08 Letter). The Guild objected, but ultimately provided a letter explaining that the videos had been transferred to I–Witness. (Letter of Robert J. Boyle dated Feb. 14, 2008, attached as Exh. Q to Mirro 3/14/08 Letter).

The City has moved to enforce the January 2008 Subpoena, and the Guild has cross-moved to quash it. The Guild argues, first, that it does not have possession or control of the videotapes, having relinquished them to I–Witness in 2005. (Bentley Decl., ¶¶ 26–31). However, it contends that it has retained control of the legal observer notes and corresponding cover sheets, even though those documents were also transferred to I–Wit-

ness. (Declaration of Robert J. Boyle dated April 10, 2008 ("Boyle Decl."), ¶¶ 6, 11). Nevertheless, the Guild maintains that these documents are protected from discovery by the work product doctrine and by the First Amendment rights of association of the Guild and its members and legal observers. (Boyle Decl., ¶¶ 12–21; Bentley Decl., ¶¶ 20–25; Memorandum of Law in Opposition to Motion to Enforce Subpoena and in Support of Cross Motion to Quash ("Guild Memo.") at 4–18).

Meanwhile, the City served I–Witness with a subpoena virtually identical to the January 2008 Subpoena served on the Guild. (Subpoena dated April 7, 2008 (the "April 2008 Subpoena"), attached as Exh. A to Declaration of Harry Sandick dated June 18, 2008 ("Sandick Decl.")). The Guild seeks to intervene in order to move to quash the April 2008 Subpoena, asserting the same arguments with respect to legal observer notes and cover sheets as it does in its motion to quash the January 2008 Subpoena. (Letter of Robert J. Boyle dated April 15, 2008).

For its part, I–Witness attempted to negotiate an agreement with the City for production of the videotapes. However, discussions foundered over whether the April 2008 Subpoena called for any videotapes that depicted RNC-related protests generally or only those that showed actual arrests of demonstrators. Consequently, the City served a new and broader subpoena, seeking "videotapes, photographs, notes and any other evidence (or potential evidence) relating to *protests, demonstrations or* arrests made between August 26, 2004 and September 3, 2004 (around the time of the Republican National Convention) in New York City." (Subpoena dated June 4, 2008 (the "June 2008 Subpoena"), attached as Exh. B to Sandick Decl. (emphasis added)).

I–Witness now moves to quash both the April 2008 Subpoena and the June 2008 Subpoena. It raises familiar arguments that the subpoenas are unduly burdensome and seek redundant and duplicative material. (Memorandum of Law in Support of Non–Party I–Witness Video's Motion to Quash or Modify the Subpoenas *Duces Tecum* and *Ad Testificandum* Served by the New York City Law Department ("I–Witness Memo.") at 10–14,

18–19). I–Witness also contends that the videotapes were created for its commercial benefit, and that its right to maintain confidential research and commercial information would be violated if the City is provided access without paying the commercial value of the tapes. (I–Witness Memo. at 14–18). Finally, I–Witness argues that being required to disclose the identities of its volunteers would violate their First Amendment right of association. (I–Witness Memo. at 19–23). In the event that production is ordered, I–Witness seeks a stringent protective order. (I–Witness Memo at 23–25).

*Discussion*

Generally, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense[.]" Fed.R.Civ.P. 26(b)(1). "Although not unlimited, relevance, for purposes of discovery, is an extremely broad concept." *Condit v. Dunne,* 225 F.R.D. 100, 105 (S.D.N.Y.2004); *see Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978); *Convolve, Inc. v. Compaq Computer Corp.,* 223 F.R.D. 162, 167 (S.D.N.Y.2004); *Melendez v. Greiner,* No. 01 Civ. 07888, 2003 WL 22434101, at *1 (S.D.N.Y. Oct.23, 2003). "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). The burden of demonstrating relevance is on the party seeking discovery. *See Mandell v. Maxon Co.,* No. 06 Civ. 460, 2007 WL 3022552, at *1 (S.D.N.Y. Oct. 16, 2007).

Once relevance has been shown, it is up to the responding party to justify curtailing discovery. *Condit,* 225 F.R.D. at 106; *Melendez,* 2003 WL 22434101, at *1. "[T]he court must limit the frequency or extent of discovery" when:

(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

(ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

(iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed.R.Civ.P. 26(b)(2)(C). Similarly, a subpoena is subject to being quashed or modified if, among other things, it "subjects a person to undue burden," Fed.R.Civ.P. 45(c)(3)(A)(iv), or requires "disclosing a trade secret or other confidential, research, development, or commercial information." Fed. R.Civ.P. 45(c)(3)(B)(i). In assessing these considerations, "special weight [should be given] to the burden on non-parties of producing documents to parties involved in litigation." *Travelers Indemnity Co. v. Metropolitan Life Insurance Co.,* 228 F.R.D. 111, 113 (D.Conn.2005); *see also Fears v. Wilhelmina Model Agency, Inc.,* No. 02 Civ. 4911, 2004 WL 719185, at *1 (S.D.N.Y. April 1, 2004) ("[T]he Court should be particularly sensitive to weighing the probative value of the information sought against the burden of production on [a] nonparty."); *Concord Boat Corp. v. Brunswick Corp.,* 169 F.R.D. 44, 49 (S.D.N.Y.1996) ("[T]he status of a witness as a nonparty to the underlying litigation 'entitles [the witness] to consideration regarding expense and inconvenience.'" (alteration in original)). Of course, "discovery should not simply be denied on the ground that the person or entity from whom it is sought is not a party to the action.... A better approach is for the court to take steps to relieve a nonparty of the burden of compliance even when such accommodations might not be provided to a party." *Wertheim Schroder & Co. v. Avon Products, Inc.,* No. 91 Civ. 2287, 1995 WL 6259, at *6 (S.D.N.Y. Jan.9, 1995).

An evaluation of undue burden requires the court to weigh the burden to the subpoenaed party against the value of the information to the serving party. Whether a subpoena imposes an "undue burden" depends upon "such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity

with which the documents are described and the burden imposed."

*Travelers Indemnity Co.,* 228 F.R.D. at 113 (quoting *United States v. International Business Machines Corp.,* 83 F.R.D. 97, 104 (S.D.N.Y.1979)); *accord Bridgeport Music Inc. v. UMG Recordings, Inc.,* No. 05 Civ. 6430, 2007 WL 4410405, at *2 (S.D.N.Y. Dec. 17, 2007); *Night Hawk Ltd. v. Briarpatch Ltd.,* No. 03 Civ.1382, 2003 WL 23018833, at *8 (S.D.N.Y. Dec. 23, 2003). The subpoenas at issue here may now be analyzed in light of these principles.

### A. *I–Witness Video*

### 1. *Videotapes*

### a. *Commercial Harm*

■ I–Witness argues that by demanding production of the videotapes, the City seeks to obtain confidential commercial information. There are at least three respects in which information may be subject to protection from discovery because of its commercial value. The most common situation is that in which the producing party is able to demonstrate that the dissemination of confidential information will place it at a competitive disadvantage. *See, e.g., Solow v. Conseco, Inc.,* No. 06 Civ. 5988, 2008 WL 190340, at *1, *4–5 (S.D.N.Y. Jan. 18, 2008) (declining to enforce subpoena for non-party asset and financial information); *Infosint S.A. v. H. Lundbeck A.S.,* No. 06 Civ. 2869, 2007 WL 1467784, at *1–2 (S.D.N.Y. May 16, 2007) (granting protective order covering proprietary technical information in patent case); *IPC Information Systems, LLC v. Odyssey Group, Inc.,* 232 F.R.D. 206, 207 (S.D.N.Y. 2005) (requiring disclosure of customer lists subject to protective order). In these circumstances, the commercial value of the information at issue can generally be protected by a protective order limiting the purposes for which the information can be used and the extent to which it can be disseminated.

Less common are cases that do not involve a competitive risk but instead concern information that the producing party has accumulated through its own time and effort. In that circumstance, the argument is that it is unjust to require a party to turn over the fruit of its labor in discovery without receiving adequate compensation. For example, in *In re Silicone Gel Breast Implants Products Liability Litigation,* No. 92–P–10000S, 1996 WL 1358526 (N.D.Ala. April 11, 1996), the plaintiffs subpoenaed the underlying data for research known as the Nurses' Health Study ("NHS") that was the basis of an influential article addressing issues central to the litigation; the plaintiffs sought the information "so that their own experts [could] verify the accuracy of [the] findings ... in the article and be able to conduct other statistical analyses using such data." *Id.* at *1 (footnote omitted). The NHS was "an ongoing research project funded primarily by the National Institutes of Health-started in 1976, long before and without regard to the current controversies respecting breast implants." *Id.* The databases constituted "research expected to be kept confidential, even though from time to time selected data have been used by investigators associated with NHS as the basis for published articles." *Id.* The court declined to enforce the subpoena, finding that

> [t]o the extent plaintiffs would use data from the NHS databases in order to conduct their own statistical analyses, they would effectively be appropriating research data collected by the NHS project at great expense over a 20–year period and would be jeopardizing continued use of this essentially invaluable resource for future investigations.

*Id.* at *2 (footnote omitted). Furthermore, the court determined that neither monetary compensation nor a protective order would be adequate to ensure the continued viability of the ongoing study if the requested data were released. *Id.* at *3.

In *Klay v. All Defendants,* 425 F.3d 977 (11th Cir.2005), the court faced a similar situation but addressed a slightly different issue. There, the plaintiffs relied on some data from the American Medical Association (the "AMA") in their complaint. *Id.* at 980. In response, the defendants, managed health care providers, subpoenaed the AMA's annual reports along with underlying data utilized by the AMA. *Id.* The district court compelled production of the requested information sub-

ject to a protective order that, among other things, limited use of the data to litigation purposes. *Id.* The AMA appealed, arguing that if it were to disclose the data, it should be entitled to the same license fee normally charged for its dissemination. *Id.* at 980–81. The Court of Appeals determined that "reasonable compensation must accompany the disclosure of confidential research." *Id.* at 983. However, it also found that "[a]lthough reasonable compensation may require more than reimbursement for the costs of production, it need not always be so." *Id.* at 984. Rather, "compensation is required when compliance with a subpoena causes an actual property loss." *Id.* In order to ascertain the amount of compensation required, the court developed the following standard:

> The gain to the party seeking confidential information through a subpoena is not the measure of compensation reasonably owed to the owner of that information. The measure is the loss to the owner of the property. If the enforcement of a subpoena under Rule 45(c)(3)(B) causes no loss, then the amount of compensation reasonably owed will be zero. If the loss to the owner of the information is substantial, then so will be the amount of compensation even if the gain to the taker of the information is slight.

*Id.* at 985. On the facts of that case, the court concluded that compensation in the form of a license fee was unwarranted:

> The disclosure to outside counsel of that material did not deprive the AMA of the use of its property in any way. The disclosure also did not deprive the AMA of the opportunity to sell its intellectual property at its market price to any willing buyers, including the managed care providers, because the managed care providers were not allowed to use this data for nonlitigation purposes.

*Id.* at 986.

■ The third situation in which a demand for commercial information may be quashed or modified arises where the dissemination of that information will damage the producing party's business in some way other than providing a competitor with an advantage. An example is *Gonzales v. Google, Inc.,* 234 F.R.D. 674 (N.D.Cal.2006), where the Government sought information from Google, an internet provider, including query logs consisting of internet searches conducted by Google subscribers. *Id.* at 679. Google contended that release of such information would harm its business by deterring some users from conducting some searches, and the court agreed. *Id.* at 683–84. It found that "even if an expectation . . . that Google would prevent disclosure to the Government of its users' search inquiries is not entirely reasonable, . . . at least some of Google's users expect some sort of privacy in their searches." *Id.* at 684. "Such an expectation does not rise to the level of an absolute privilege, but does indicate that there is a potential burden as to Google's loss of goodwill if Google is forced to disclose search queries to the Government." *Id.* Consequently, the court denied the Government access to the query logs. *Id.* at 686.

■ In light of these principles, it can now be determined whether the videotapes should be immune from discovery because their disclosure would impair the business of I–Witness.

### i. *Competitive Harm*

I–Witness does not contend that release of the videotapes to the City would harm it competitively, or even that it has commercial competitors. Competition-related issues therefore need not be addressed.

### ii. *Loss of Income*

I–Witness does argue that because it charges a fee (at least under some circumstances) to parties who want copies of the videotapes, its ability to realize such income will be undermined if the videotapes are subject to subpoena without compensation. This contention fails for two reasons.

First, as a factual matter, I–Witness has failed to demonstrate that it is engaged in commercial activity in any conventional sense. It acknowledges that it "freely distributed videotapes to the defense attorneys who were associated with the NLG's mass defense efforts[.]" (Clancy Decl., ¶ 24). Yet there is no indication that I–Witness sought

to preserve the commercial value of those tapes by distributing them pursuant to a license that would have limited their use to the criminal cases. Apparently, nothing prevented defense counsel from turning over the tapes to counsel in the civil cases or, indeed, from using them for any purpose whatsoever. To be sure, I–Witness did create a fee schedule in connection with the civil cases and was able to obtain compensation of $2,500.00 for providing five tapes to one group of plaintiffs' attorneys. (Clancy Decl., ¶¶ 24–25). Such insignificant demand, however, casts doubt on the commercial value of the enterprise and therefore on the right of I–Witness to obtain compensation for producing the tapes in response to the subpoenas.

■ More importantly, the right to compensation for information obtained by subpoena arises in circumstances where the information was created for purposes independent of litigation. Thus, in the *Silicone Gel Breast Implants* case, the court observed that the data at issue was generated "without regard to the current controversies." 1996 WL 1358526, at *1. That is not the case here. The very purpose of I–Witness is to "document protests and demonstrations ... to educate the public and to expose and correct the manipulation of the truth by the police both in the courts and in the court of public opinion." (Clancy Decl., ¶ 6).

Yet, to the extent that I–Witness collects information for evidentiary purposes, it cannot withhold that information. "The duty to testify has long been recognized as a basic obligation that every citizen owes his Government." *United States v. Calandra*, 414 U.S. 338, 345, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Indeed, "the duty to provide evidence 'has long been considered to be almost absolute.'" *Klay*, 425 F.3d at 986 (quoting *In re Grand Jury No. 76–3 Subpoena Duces Tecum*, 555 F.2d 1306, 1308–09 (5th Cir.1977)). Consequently, the observations of a witness cannot be commercialized. If an entrepreneur were to set up a camera at a busy intersection hoping to record an automobile accident and then sell the film to the parties in the resulting tort suit, there is little doubt that a court would enforce a subpoena for the evidence without requiring the litigants to pay a fee to the film-maker. Though the motives of I–Witness are more noble, the logic is the same.

I–Witness also suggests that the videotapes have commercial value because they are of interest to academics, some of whom have approached I–Witness to inquire about their availability. (Supplemental Declaration of Eileen Clancy dated July 25, 2008 ("Clancy Supp. Decl."), ¶ 5). This argument is more persuasive. However, as long as disclosure of the videotapes is coupled with a protective order that limits their use to this litigation and forbids further dissemination, their value remains intact because they will still only be available to researchers willing to pay whatever I–Witness chooses to charge. *See Klay*, 425 F.3d at 986.

### iii. *Loss of Goodwill*

I–Witness also asserts that enforcement of the subpoenas will impair its goodwill:

> I–Witness Video relies on its reputation in the activist community and upon the goodwill of activists in order to conduct its business. If [I–Witness'] archive is disclosed to the government, [I–Witness'] ability to function would be irreparably impaired because [I–Witness] would not be able to provide assurance to activists who provide [I–Witness] with video footage (including members of [I–Witness], NLG observers, independent filmmakers, or freelance journalists) that ... videotape filmed in order to aid protesters and prevent them from being prosecuted unjustly could be used to build law enforcement dossiers or aid in the prosecution of the protesters.

(Clancy Decl., ¶ 29). I–Witness supports this argument in part with a declaration from an anonymous volunteer videographer who states that he and other activists would not work on future projects if they knew that their film would be "given to the City, so that the City and the NYPD could use it for its [sic] own investigative purposes." (Declaration of [Redacted] dated July 24, 2008, ¶¶ 2–3, 11).[3] But an erroneous presumption about

---

3. The City has moved to strike this declaration both because it was only submitted on reply and

the right to withhold evidence cannot be the basis for goodwill. In contrast to the internet users in *Google*, I–Witness and its volunteers did not expect their work to be kept confidential; to the contrary, they expected it to be used in defense of protesters who, in their view, were unjustly arrested. Though they may have anticipated that they could disclose it selectively, disseminating what would be helpful to their cause and retaining the balance, this assumption was legally unwarranted.

Nevertheless, I–Witness and the volunteers did have legitimate expectations that the videotapes would not be used for purposes apart from litigation concerning the RNC. Accordingly, the tapes shall be subject to a strict protective order limiting their use to these cases.

b. *Burden*

■ I–Witness contends that the City's subpoenas are unduly burdensome in part because they seek production of videotapes that are irrelevant. There is some merit to this argument. Apparently, some of the videotapes depict demonstrations at locations where no arrests were made during the RNC. The City contends that these tapes are material because they undermine the plaintiffs' claims that arrests were made in retaliation for the exercise of First Amendment rights. However, the fact that the City did not always violate the rights of protesters is not probative of whether it ever did.

I–Witness also objects that even when a videotape depicts an arrest location, footage of any activity other than the arrest itself is irrelevant. This argument is less persuasive. The arrests did not take place in a vacuum, and the circumstances leading up to the point where a plaintiff is taken into custody are germane. For example, it is highly relevant what the plaintiff was doing prior to the arrest, whether a police officer issued an order to the crowd to disperse, whether a particular plaintiff was in a position to hear that order, and whether that plaintiff attempted to comply. It is conceivable that tapes of protests where arrests took place could be edited to redact footage that is plainly irrelevant, but that process would itself create a significant burden with no corresponding benefit. Tapes that depict demonstrations on days and at locations where arrests occurred are therefore subject to discovery.

Next, I–Witness maintains that the City has no need for its videotapes because the defendants are already in possession of hundreds of other tapes of RNC-related protests and arrests. But each videotape is unique. Not only do they capture different viewpoints, but they often depict different events at different times during extended demonstrations. For example, the NYPD's TARU teams did not always arrive at a protest location at the outset of a demonstration, and so failed to record information contained in videotapes taken by I–Witness volunteers or freelance photographers. (Defendants' Supplemental Memorandum of Law in Opposition to the Motion of Non–Party I–Witness Video to Quash Subpoenas at 11–12).

I–Witness also expresses concern about the cost of duplicating the videotapes. However, the City has made it clear that it would assume the entire expense of the duplication process.

Finally, I–Witness argues that it will suffer a loss of goodwill because disclosure of the videotapes will cause it to be perceived of as an "arm of the government." (Reply Memorandum of Law in Support of Non–Party I–Witness Video's Motion to Quash or Modify the Subpoenas *Duces Tecum* and *Ad Testificandum* served by the New York City Law Department ("I–Witness Reply Memo.") at 11). But, as I–Witness itself acknowledges, any such perception would be entirely erroneous. The City cannot be denied legitimate discovery on the ground that unidentified persons may draw inaccurate and unsupported conclusions about I–Witness as a result.

because it was filed without identification of the declarant. In light of my determination on the merits, the City's application is denied as moot. I–Witness' motion to strike the City's surreply is likewise denied. Both parties sought and received ample opportunity to air all of their arguments.

#### c. *Duplicative Materials*

 I–Witness is on firmer ground when it contends that the City is seeking video-tapes that are literal copies of tapes that the City has in its possession. I–Witness came into possession of tapes that were created by the NYPD's TARU unit and then were pro-vided to defense counsel in the course of the criminal prosecution of protesters. Since these were created by the City in the first instance, there is no basis for requiring I–Witness to expend effort culling these same tapes and returning copies to their creators.

By contrast, I–Witness received other tapes from the Office of the New York Coun-ty District Attorney ("DANY"). DANY is a non-party to this action, just as I–Witness is. While the City might have subpoenaed these tapes from DANY rather than from I–Wit-ness, it was under no obligation to do so. Therefore, I–Witness shall produce the vid-eotapes that it received from DANY.

#### 2. *Identity of Videographers*

I–Witness also objects to the subpoenas insofar as they seek the identity of the vid-eographers on the ground that revealing that information would impinge on the film-mak-ers' First Amendment right of association. This nettlesome issue need not now be decid-ed. Since the City would need to identify the videographers only for purposes of authenti-cating the tapes, it has agreed not to solicit their identities at this time, provided that counsel for I–Witness collect and maintain that information, so that it will be preserved in the event that authentication becomes an issue in the future. (Defendants' Memoran-dum of Law in Opposition to the Motion of Nonparty I–Witness Video to Quash Subpoe-nas at 33). That is an appropriate interim solution.

#### 3. *Documents*

I–Witness next complains that in the April 2008 Subpoena, "the City is now seeking all of [I–Witness'] paper documents that relate to the RNC protests (and not only those that relate to the arrests)." (I–Witness Memo. at 13). Initially, a distinction must be drawn between those documents generated by I–Witness and those that were placed in its possession by the Guild. The latter category will be discussed below in connection with the analysis of the Guild's motion to quash the subpoenas issued to it.

 As to I–Witness' own documents, its objection as to the breadth of the subpoena is well-taken. Like any other activist organiza-tion that was preparing for the RNC, I–Witness likely has a variety of documents concerning its plans that have no relevance to the claims asserted in the RNC litigation. There are, however, two types of documents that may be germane. First, to the extent that I–Witness possesses documents relating to the arrest or detention of any protester (other than those it is simply warehousing for the Guild), it shall produce them. Second, it shall also disclose any documents that reflect the creation, alteration, or preservation of the videotapes, including any index of those tapes. To the extent that those documents contain the names of videographers, they may be redacted consistent with the ruling that issues of authentication will be deferred.

#### 4. *Deposition of Eileen Clancy*

 I–Witness also objects to the sub-poenas insofar as they seek the deposition testimony of Eileen Clancy because the City "seeks to question Ms. Clancy based on her expertise as an archivist and videographer, almost as though she had been retained by the City as an expert witness." (I–Witness Reply Memo. at 18). Indeed, Rule 45(c)(3)(B)(ii) permits the court to quash a subpoena that would require "disclos[ure][of] an unretained expert's opinion." But, irre-spective of her expertise, Ms. Clancy has relevant factual information concerning I–Witness' possession and preservation of the subject videotapes. The City is entitled to obtain that information for purposes of estab-lishing the integrity and authenticity of the tapes. *See Disability Rights Council of Greater Washington v. Washington Metro-politan Transit Authority,* 242 F.R.D. 139, 149–50 (D.D.C.2007) (treating consultant with factual information obtained independent of

litigation as fact witness).[4]

### 5. Costs of Responding

As noted above, the City has agreed that it will pay for duplicating the videotapes. In addition, as a non-party, I–Witness should not be saddled with the expense of culling responsive information from its files and archives. Therefore, the City shall pay the reasonable costs incurred by I–Witness in complying with the subpoenas.

### B. National Lawyers Guild

### 1. Videotapes

The Guild apparently does not contest the production of the videotapes. Nor would it have standing to do so, having represented that it relinquished control over the tapes to I–Witness in 2005. (Bentley Decl., ¶¶ 26–31). Moreover, in 2006, the Guild consented to an order that required it to produce all requested videotapes that were in its possession, subject to protective measures incorporated in the order. (10/20/06 Order).

### 2. Photographs and Undeveloped Film

■ In that same order, the Guild was directed to produce all photographs responsive to the City's subpoena (10/26/06 Order), and the Guild subsequently represented that it had done so. (Boyle 12/13/06 Letter). Now, however, the Guild acknowledges that it in fact is in possession of additional photographs and undeveloped film that had been placed in evidence envelopes and were not identified in 2006 as responsive to the City's subpoena. (Declaration of Robert J. Boyle dated July 3, 2008 ("Boyle 7/3/08 Decl."), ¶¶ 18–19). The Guild contends that these items are protected from disclosure by the attorney work product doctrine. (Boyle 7/3/08 Decl., ¶ 19). This argument has been waived. The failure to assert any discovery immunity in 2006—and, indeed, the agreement to produce responsive photographs without qualification-forfeited any claim of work product. *See Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 236 (E.D.N.Y.

2007) (failure to object in timely manner and with specificity waives privilege); *OneBeacon Insurance Co. v. Forman International, Ltd.*, No. 04 Civ. 2271, 2006 WL 3771010, at *7 (S.D.N.Y. Dec. 15, 2006) (same, collecting cases); *Smith v. Conway Organization, Inc.*, 154 F.R.D. 73, 76 (S.D.N.Y.1994) (finding work product protection waived by failure to assert with specificity in timely fashion). The Guild shall therefore produce the remaining photographs and film, with the City bearing any costs associated with the development and duplication.

### 3. Documents

■ The balance of the dispute between the Guild and the City concerns documents that the Guild contends are protected by work product immunity: legal observer notes, evidence intake forms, evidence request forms, indexes, and cover sheets. The work product doctrine has been partially codified in the Federal Rules of Civil Procedure. *See In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002*, 318 F.3d 379, 383 (2d Cir.2003) (work product doctrine "codified in part" in Rule 26(b)(3)); *In re Grand Jury Subpoena*, 220 F.R.D. 130, 141 (D.Mass.2004) (work product doctrine "partially codified" in Rule 26(b)). Rule 26(b)(3) provides in part:

> [A] party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative [unless] the party [seeking discovery] shows it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means. If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

Fed.R.Civ.P. 26(b)(3)(A), (B). The party seeking the protection of the work product doctrine "bears the heavy burden of estab-

---

4. I–Witness' concern that Ms. Clancy will be required to utilize her expertise to determine whether videotapes in the possession of I–Witness are duplicative of tapes that the City has already obtained is moot; as discussed above, I–Witness shall produce all tapes except those created by the NYPD. The burden of comparing one tape to another therefore falls on the City.

lishing its applicability." *In re Grand Jury Subpoena Dated July 6, 2005,* 510 F.3d 180, 183 (2d Cir.2007).

Of course, the documents at issue here were not created in connection with the RNC civil litigation since the Guild did not expect to provide representation in civil cases; rather they were prepared in anticipation of defending criminal charges brought against persons arrested at the RNC. (Bentley Decl., ¶¶ 13–15). However, as the Supreme Court has noted, albeit in dicta, "the literal language of the Rule protects materials prepared for *any* litigation or trial as long as they were prepared by or for a party to the subsequent litigation." *Federal Trade Commission v. Grolier Inc.,* 462 U.S. 19, 25, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983) (citation omitted) (emphasis in original). Consistent with *Grolier,* the weight of authority now clearly favors protecting work product that was generated as part of an earlier litigation at least where, as here, that litigation is related to the current suit. *See Cellco Partnership v. Nextel Communication, Inc.,* No. M8–85, 2004 WL 1542259, at *1 (S.D.N.Y. July 9, 2004); *Bullard v. City of New York,* No. 01 Civ. 11613, 2004 WL 875730, at *3 (S.D.N.Y. April 23, 2004); *A.I.A. Holdings, S.A. v. Lehman Brothers, Inc.,* No. 97 Civ. 4978, 2002 WL 31556382, at *5 (S.D.N.Y. Nov. 15, 2002); *U.S. Information Systems, Inc. v. International Brotherhood of Electrical Workers Local Union No. 3,* No. 00 Civ. 4763, 2002 WL 31093619, at *1-2 (S.D.N.Y. Sept. 17, 2002).

▪ Nevertheless, the City argues that the Guild has not shown "that it is a 'representative' of any party to this litigation." (Defendants' Memorandum of Law in Opposition to the Motions of Non-party National Lawyers Guild to Intervene and to Quash Subpoenas at 17). As one court has observed, "the [Supreme] Court [in *Grolier*] specifically found that the circumstance of subsequent litigation does not restrict the work product protection, but that the identity and continuity of parties does." *Tubar v. Clift,* No. C05–1154, 2007 WL 30872, at *4 (W.D.Wash. Jan. 4, 2007). Thus, insofar as the City is arguing that work product protection does not attach simply because the Guild

does not represent plaintiffs in the current civil litigation, its argument is legally untenable. Work product immunity does not evaporate merely because a party retains different counsel in subsequent litigation.

▪ To the extent that the City maintains that the Guild was not a "representative" of the current plaintiffs in connection with the criminal proceedings, the City is factually wrong. In addition to soliciting lawyers to provide individual representation at arraignments and other proceedings for protesters who were arrested during the RNC (Bentley Decl., ¶ 14), the Guild brought a petition for a writ of habeas corpus on behalf of all of the arrestees alleging, among other things, that they had been arrested without probable cause and subjected to unduly lengthy detention. (Petition in Support of Writ of Habeas Corpus, *People ex rel. The National Lawyers Guild v. Kelly,* attached as Exh. E to Reply Declaration of Robert J. Boyle dated Aug. 5, 2008 ("Boyle Reply Decl.")). In response to that petition, a New York State Supreme Court judge issued a series of orders for the release of the arrestees who were detained and, when his orders were not promptly complied with, made a preliminary finding that the City was in contempt. (Stipulation and Settlement of Discontinuance ("Contempt Stip."), attached as Exh. F to Boyle Reply Decl., at 2–3). Ultimately, the contempt proceedings were settled prior to a hearing. (Contempt Stip.). In order to trigger the protection of the work product doctrine, the Guild need not have had a formal attorney-client relationship with the arrestees; indeed, the Guild has not asserted the attorney-client privilege as a basis for withholding the materials at issue. Rather, work product is that which is generated in anticipation of litigation by a "party or its representative (including the … party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed.R.Civ.P. 26(b)(3)(A). Thus, materials created by the Guild, which was recognized by the New York State Supreme Court as representative of the arrestees for purposes of adjudicating the legality of their detention, qualifies for work product protection. *See Kallas v. Carnival Corp.,* No. 06–201150–CIV, 2008 WL 2222152, at

*3–4 (S.D.Fla. May 27, 2008) (holding that results of telephone survey of putative class members constituted work product); *Moreno v. Autozone, Inc.,* No. C–05–4432, 2008 WL 906510, at *1–2 (N.D. Cal. April 1, 2008) (finding questionnaires completed by putative class members to be work product); *Equal Employment Opportunity Commission v. Carrols Corp.,* 215 F.R.D. 46, 51–52 (N.D.N.Y.2003) (finding questionnaires sent by EEOC to employees on whose behalf agency contemplated litigation to be work product).

▮▮▮▮ Two further questions must be answered, however, before it can be determined whether the materials at issue are entitled to immunity from discovery. First, the materials must be categorized as either "fact work product" or "opinion work product."

> [F]act work product may encompass factual material, including the result of a factual investigation. In contrast, opinion work product reveals the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative, and is entitled to greater protection than fact work product. To be entitled to protection for opinion work product, the party asserting the privilege must show a real, rather than speculative, concern that the work product will reveal counsel's thought processes in relation to pending or anticipated litigation.

*In re Grand Jury Subpoena Dated July 6, 2005,* 510 F.3d at 183–84 (citations and quotation marks omitted). Then, if the material is fact work product, it must be determined whether the requesting party has shown substantial need for its production and the inability to obtain equivalent information from other sources. *See United States v. Adlman,* 134 F.3d 1194, 1197, 1204 (2d Cir.1998). Opinion work product, on the other hand, will rarely, if ever, be subject to disclosure. *Id.* In applying these principles, it will be useful to consider the different types of documents requested by the City.

#### a. Legal Observer Notes

▮▮▮ The nature of the legal observer notes can be inferred from the instructions given to the observers. According to the Guild, the observers were alerted to "important objective factors to note when observing arrests." (Bentley Decl., ¶ 15). Specifically, they were "to note the names and descriptions of arrestees, names and badge numbers of police, and time, location and other identifying circumstances of the arrests." (Bentley Decl., ¶ 15). The observers were also instructed to "contact potential witnesses at the scene of an arrest for their names and telephone numbers, so that they could be later interviewed by attorneys." (Bentley Decl., ¶ 15). According to the Guild's written guidelines, the primary responsibility of the legal observers was to document arrests, while a secondary responsibility was to document police misconduct by noting, for example, injuries to protesters and efforts by police to close off the ability to leave an area. ("Responsibilities of a Legal Observer," attached as Exh. E to Declaration of James Mirro dated July 25, 2008). Thus, the information collected by the legal observers was factual; there is no evidence that their notes reflect the thought processes of counsel.

The legal observer notes nevertheless remain protected work product unless the City can demonstrate substantial need for their disclosure and the inability to obtain equivalent information elsewhere. The City has met this burden. First, because the notes are the product of contemporaneous observations, they cannot be replicated. This is not like the situation where an investigator's notes retain their confidentiality because all parties have an equal opportunity to make the same relevant observations or interview the same witnesses. *See Feacher v. Intercontinental Hotels Group,* No. 3:06–CV–0877, 2007 WL 3104329, at *5 (N.D.N.Y. Oct. 22, 2007) (finding no substantial need for notes of witness interviews where requesting party had equal access to witnesses); *Raso v. CMC Equipment Rental, Inc.,* 154 F.R.D. 126, 128–29 (E.D.Pa.1994) (no substantial need for investigator notes where requesting party able to interview same witnesses with current memories of relevant events and to observe scene); *Zoller v. Conoco, Inc.,* 137 F.R.D. 9, 10 (W.D.La.1991) (substantial need for photographs of accident site taken by investigator where appearance changed since

date of accident). Second, while some of the information may be available through other sources such as the depositions of the plaintiffs, there is no reason to assume that each plaintiff made the same observations or recorded the same data as the legal observers. Finally, the arrests and any police misconduct go to the heart of the claims in this litigation. The legal observers notes shall therefore be produced.

### b. Secondary Forms

■ Information and evidence obtained by the Guild was also referenced in secondary forms such as evidence intake forms, evidence request forms, indexes, and cover sheets. To the extent that these documents were prepared by or under the direct supervision of Guild attorneys, they are more likely to reflect the thought processes of counsel. As opinion work product, they would be protected from disclosure by an almost absolute immunity. *See Upjohn Co. v. United States,* 449 U.S. 383, 401–02, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (holding opinion work product generally not discoverable); *In re Grand Jury Proceedings,* 219 F.3d 175, 190 (2d Cir.2000) (finding that "'at a minimum such material is to be protected unless a highly persuasive showing [of need] is made'" (quoting *Adlman,* 134 F.3d at 1204)); *In re Pfizer Inc. Securities Litigation,* No. 90 Civ. 1260, 1993 WL 561125, at *4 (S.D.N.Y. Dec.23, 1993). The City has certainly not met the heightened standard for compelling production of opinion work product.

Indeed, even if these forms were considered to be fact work product, the City has not shown substantial need for their disclosure. By virtue of this order and otherwise, the City will have access to the underlying evidence: the videotapes and the information contained in the legal observer notes. How the Guild logged that information, how attorneys might have characterized it, or when they may have sought access to it is of no relevance here. The secondary materials therefore need not be produced.

### 4. First Amendment Issues

Like I–Witness, the Guild argues that its First Amendment rights and those of the legal observers would be jeopardized if the identities of the observers were revealed to the City. As with I–Witness, an appropriate temporary resolution is to redact the names of the legal observers from their notes, provided that the Guild maintains the original documents containing the identifying information. In the event that the City, after reviewing the notes, articulates a basis for seeking the identities of the legal observers, this issue can be revisited.

### Conclusion

For the reasons discussed above, I–Witness' motion to quash the subpoenas served upon it is denied to the extent that it shall produce the videotapes of RNC protests where arrests occurred (other than those created by the NYPD), subject to a protective order strictly limiting the use of the tapes to the instant litigation. The City shall bear the costs of duplicating the tapes. I–Witness need not disclose the identity of the videographers except to its counsel, who shall maintain that information pending any dispute concerning the authenticity of the tapes. I–Witness shall produce all of its documents relating to the arrest or detention of any protester and any documents that reflect the creation, alteration, or preservation of the videotapes, including any index of those tapes. The City may take the deposition of Eileen Clancy solely with respect to I–Witness' maintenance and preservation of the tapes. I–Witness shall be entitled to reasonable compensation for the time expended and expenses incurred in complying with the subpoenas.

The Guild's motion to intervene to challenge the subpoenas issued to I–Witness is granted. Its motion to quash the subpoenas issued to it is denied, and the City's motion to enforce those subpoenas is granted, to the extent that the Guild shall produce the legal observer notes with the names and identifying information of the observers redacted. The Guild's motion to quash is granted insofar as it need not produce the remaining documents. The Guild shall be entitled to reasonable compensation for time expended and expenses incurred in complying with the subpoenas.

Each party shall bear its own costs and attorneys' fees in connection with the motions now decided. Within two weeks of the date of this order, the parties shall submit a proposed protective order placing appropriate limits on the use and dissemination of the information that is to be disclosed.

SO ORDERED.